1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10   JAMES EVANS,

11          Petitioner,              No. CIV S-06-0376 LKK GGH P

12      vs.

13   TOM L. CAREY, et al.,

14          Respondents.            FINDINGS AND RECOMMENDATIONS

15   _____/

16   I.  Introduction

17          Petitioner, now in his mid-to-late 70's,  is a state prisoner proceeding pro se with a

18   petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  In 1982 petitioner was

19   convicted of kidnapping for robbery, robbery and attempted murder.  Petitioner is serving a

20   sentence of 7 years to life.  In this action, petitioner challenges the 2004 decision by the

21   California Board of Prison Terms (BPT) finding him unsuitable for parole.  Petitioner argues that

22   the BPT's decision was not supported by sufficient evidence.  Petitioner also argues that the BPT

23   violated his right to due process by requiring him to admit guilt in order to be found suitable.

24   This was petitioner's eleventh subsequent parole suitability hearing.

25          After carefully reviewing the record, the court recommends that the petition be

26   denied.

1  II.  Anti-Terrorism and Effective Death Penalty Act (AEDPA)

2          The Antiterrorism and Effective Death Penalty Act (AEDPA) applies to this

3  petition for habeas corpus which was filed after the AEDPA became effective.  Neelley v. Nagle,

4  138 F.3d 917 (11th Cir.), citing Lindh v. Murphy, 521 U.S. 320, 117 S. Ct. 2059 (1997).  The

5  AEDPA "worked substantial changes to the law of habeas corpus," establishing more deferential

6  standards of review to be used by a federal habeas court in assessing a state court's adjudication

7  of a criminal defendant's claims of constitutional error.  Moore v. Calderon, 108 F.3d 261, 263

8  (9th Cir. 1997).

9          In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme

10 Court defined the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion

11 for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy

12 between "contrary to" clearly established law as enunciated by the Supreme Court, and an

13 "unreasonable application of" that law.  Id. at 1519.  "Contrary to" clearly established law applies

14 to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme

15 Court on a point of law, or (2) if the state court case is materially indistinguishable from a

16 Supreme Court case, i.e., on point factually, yet the legal result is opposite.

17         "Unreasonable application" of established law, on the other hand, applies to

18 mixed questions of law and fact, that is, the application of law to fact where there are no factually

19 on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

20 Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the

21 AEDPA standard of review which directs deference to be paid to state court decisions.  While the

22 deference is not blindly automatic, "the most important point is that an *unreasonable* application

23 of federal law is different from an incorrect application of law....[A] federal habeas court may not

24 issue the writ simply because that court concludes in its independent judgment that the relevant

25 state-court decision applied clearly established federal law erroneously or incorrectly.  Rather,

26 that application must also be unreasonable."  Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at

1   1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

2   objectively unreasonable nature of the state court decision in light of controlling Supreme Court

3   authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

4        The state courts need not have cited to federal authority, or even have indicated

5   awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S.

6   Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is

7   contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An

8   unreasonable error is one in excess of even a reviewing court's perception that "clear error" has

9   occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003).  Moreover, the

10  established Supreme Court authority reviewed must be a pronouncement on constitutional

11  principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

12  binding only on federal courts.  Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

13       However, where the state courts have not addressed the constitutional issue in

14  dispute in any reasoned opinion, the federal court will independently review the record in

15  adjudication of that issue.  "Independent review of the record is not de novo review of the

16  constitutional issue, but rather, the only method by which we can determine whether a silent state

17  court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

18  2003).

19       Petitioner raised the claims raised in this action in a habeas corpus petition filed in

20  the California Supreme Court.  Answer, Exhibit 4.  On February 1, 2006, the California Supreme

21  Court denied the petition by order citing In re Dannenberg, 34 Cal. 4th 1061 (2005) and In re

22  Rosenkrantz, 29 Cal. 4th 616 (2002).  Answer, Exhibit 5.  Accordingly, the court will

23  independently review the record to determine whether the denial of the petition by the California

24  Supreme Court was an unreasonable application of the facts to the due process law surrounding

25  parole suitability hearings.

26  /////

1   III.   Background

2            The factual background of petitioner's offense is relevant to the analysis of

3   petitioner's claims.  A factual summary is contained in the probation report, attached to the

4   petition as exhibit B.

5            James Eugene Evans, age 51, had a romantic relationship with Agnes "Janie"
         Whorton for approximately eight years. She is the wife of the victim, Warren
6        Whorton. Evans reportedly attempted to persuade Mrs. Whorton to leave her
         husband, however, she refused on the grounds that her religious beliefs would not
7        allow her to do this.  In the last few years, Mr. Evans expressed to several of his
         friends and acquaintances that "something should happen" to Mr. Whorton.  He
8        allegedly also stated that it would be possible to have someone "bump off" Mr.
         Whorton, since he had a lot of money and it could be made to look like a robbery.
9        In June of 1979, Mr. Evans told Mary Whatley of his "perfect plan."

10           In February of 1980, Patricia June "P.J." Miller, began to frequent the Pizza King
         Restaurant owned by Mr. Evans.  She apparently was told of Mr.Evans' idea and,
11       in December of 1980, she told Rich Poma of Mr. Evans' plan to get rid of Warren
         Whorton.  On December 11, 1980, Mr. Poma left his mother's home in Modesto,
12       enroute to Turlock to meet with Mr. Evans.  Also that afternoon, a phone call was
         placed from the home of Kenneth Krantz to the Pizza King.  It is the
13       understanding of the investigating agencies that this contact, as well as others
         between Poma, Krantz and Evans resulted in Mr. Evans offering $1,000 each to
14       Poma and Krantz, for them to murder Warren Whorton.

15           Mr. Poma and Mr. Krantz "cased" a furniture store in Riverbank, California,
         owned by Warren Whorton. The two subjects did not see a safe and then decided
16       to rob him at a second store, (Great Valley Furniture) in Oroville.  In late
         December and early January they made two trips to Oroville.  After the second
17       trip (on about January 8, 1981), they obtained several handguns.

18           On Sunday night, January 11, Krantz and Poma left Modesto and proceeded to
         Chico, where they stayed overnight in a motel.  On the next day they observed Mr.
19       Whorton's activities at the Oroville Store.

20           Sometime between 6:30 and 7:00 p.m., January 12, 1981, Krantz and Poma
         parked their car near the apartment complex where Mr. Whorton lived.  Krantz
21       armed himself with a .38 revolver, and Mr. Poma with a stolen .45, and donned
         latex surgical gloves.  When Mr. Whorton arrived at his apartment complex, they
22       reportedly confronted him while displaying the weapons in their waistbands, and
         commanded him to get back into his own car.  Mr. Poma drove the car back to the
23       furniture store, Krantz sitting on the passenger side, Mr. Whorton between them.
         Mr. Whorton was instructed by the subjects not to look at them and neither
24       subject made any apparent attempt to disguise his face.

25           After arriving at the store, the subjects had Mr. Whorton unlock the door.  Upon
         entering the store, they demanded that he open the safe, and were told that there
26       was no safe on the premises.  After a cursory search, the two defendants did not

                                              4

find a safe, and took Mr. Whorton upstairs where he was tied up with an electrical cord and placed on a bed.  The store was then searched for money, Mr. Krantz finding approximately $120.00 in the cash box of the office area.  Poma reportedly locating a small amount of money in a money clip which was carried in Mr. Whorton's pocket.  It appears that, for whatever reason, Poma then struck Mr. Whorton in the head three or four times with a hammer which was found somewhere inside the store, after which Mr. Krantz cut the victim's throat with a straight edge razor he had been carrying on his person.  Leaving the victim for dead, the two subjects departed the store, returning to the apartment complex in the victim's vehicle.  They then got into the car in which they had been driving and returned to Modesto.

Early the following morning, Mr. Whorton was discovered by his employees.  He was immediately rushed to a hospital, underwent surgery and although in extremely critical condition for some days, he survived.

It appears that after the incident, Mr. Poma bragged about it to at least two acquaintances in the Modesto area, one of whom contacted law enforcement.  An investigation was effected which ultimately led to the arrest of Krantz and Poma on January 27, in Modesto.  They were shortly thereafter returned to custody to this jurisdiction where they were charged and convicted with kidnapping for the purpose of robbery, robbery, and attempted murder.  Initial pleas of not guilty were entered and, on June 15, 1981, both defendants entered pleas of guilty for kidnapping for robbery and attempt[ed] murder, both having personally inflicted great bodily injury in connection with the commission of the attempted murder.  On July 9, 1981, both Krantz and Poma were sentenced to state prison for consecutive sentences of life and 108 months plus 30 months enhancement.

James Evans had been arrested on February 19, 1981, for the same offenses as Krantz and Poma.  He pled not guilty to all charges and was granted a jury hearing.  That hearing began September 28, 1981, and was presided over by the Honorable Lucian Vandergrift.  In November of 1981, Judge Vandergrift was seriously injured in an automobile accident and the hearing was recessed.  Approximately four months later, the hearing was reconvened with the Honorable Reginal Watt presiding.  On April 14, 1982, the jury was out for less than two hours, returning a verdict of guilty on all counts.

IV.  Discussion

        In Sass v. California Bd. of Prison Terms, 461 F.3d 1123 (9th Cir. 2006), the

Ninth Circuit found that California law gives rise to a federally protected liberty interest in parole

release.

        In the parole context, the requirements of due process are met if "some evidence"

supports the decision."  Sass, 461 F.3d at 1128-1129.  In reviewing the BPT decision, the court

analyzes whether the factors relied on by the BPT, set forth in the relevant regulations, are

1   supported by some evidence.

2              Cal. Code of Regulations, section 2402(c), sets forth the circumstances tending to

3   show unsuitability.  The court lists those of significance here:

4              (1) Commitment Offense.  The prisoner committed the offense in
             an especially heinous, atrocious or cruel manner.  The factors to be
5            considered include:

6            (A) Multiple victims were attacked, injured or killed in the same or separate
             incidents.
7
             (B) The offense was carried out in a dispassionate and calculated
8            manner, such as an execution-style manner.

9            *****

10           (D) The offense was carried out in a manner which demonstrates an
             exceptionally callous disregard for human suffering.
11
             (E) The motive for the crime is inexplicable or very trivial in
12           relation to the offense.

13           (2) Previous Record of Violence. The prisoner on previous
             occasions inflicted or attempted to inflict serious injury on a
14           victim, particularly if the prisoner demonstrated serious assaultive
             behavior at an early age.
15
             (3) Unstable Social History.  The prisoner has a history of unstable
16           or tumultuous relationships with others.

17           *****

18           *****

19           (6) Institutional Behavior.  The prisoner has engaged in serious misconduct in
             prison or jail.
20
             Section 2402(d) sets forth the circumstances tending to indicate suitability:
21
             (1) No Juvenile Record.  The prisoner does not have a record of
22           assaulting others as a juvenile or committing crimes with a
             potential of personal harm to the victims.
23
             (2) Stable Social History.  The prisoner has experienced reasonably
24           stable relationships with others.

25           (3) Signs of Remorse.  The prisoner performed acts which tend to
             indicate the presence of remorse, such as attempting to repair the
26           damage, seeking help for or relieving suffering of the victim, or

                                          6

1    indicating that he understands the nature and magnitude of the
     offense.

2

3    (4) Motivation for the Crime.  The prisoner committed his crime as
     the result of significant stress in his life, especially if the stress has
     built over a long period of time.

4

5    (5) Battered Woman Syndrome . . .

6    (6) Lack of Criminal History.  The prisoner lacks any significant
     history of violent crime.

7    (7) Age.  The prisoner's present age reduces the probability of
     recidivism.

8

9    (8) Understanding and Plans for Future.  The prisoner has made
     realistic plans for release or has developed marketable skills that
     can be put to use upon release.

10

11   (9) Institutional Behavior.  Institutional activities indicate an
     enhanced ability to function within the law upon release.

12          In Biggs v. Terhune, 334 F.3d 910 (9th Cir. 2003) the Ninth Circuit indicated that

13   a continued reliance on an unchanging factor such as the circumstances of the offense could

14   result in a due process violation.  Biggs was serving a sentence of twenty-five years to life

15   following a 1985 first degree murder conviction.  In the case before the Ninth Circuit, Biggs

16   challenged the 1999 decision by the BPT finding him unsuitable for parole despite his record as a

17   model prisoner.  334 F.3d at 913.  While the Ninth Circuit rejected several of the reasons given

18   by the BPT for finding Biggs unsuitable, it upheld three:  1) petitioner's commitment offense

19   involved the murder of a witness; 2) the murder was carried out in a manner exhibiting a callous

20   disregard for the life and suffering of another; 3) petitioner could benefit from therapy.  334 F.3d

21   at 913.

22          The Ninth Circuit cautioned the BPT regarding its continued reliance on the

23   gravity of the offense and petitioner's conduct prior to the offense:

24          As in the present instance, the parole board's sole supportable
            reliance on the gravity of the offense and conduct prior to

25          imprisonment to justify denial of parole can be initially justified as
            fulfilling the requirements set forth by state law.  Over time,

26          however, should Biggs continue to demonstrate exemplary

1  behavior and evidence of rehabilitation, denying him a parole date
2  simply because of the nature of his offense would raise serious
   questions involving his liberty interest.

3  334 F.3d at 916.[1]

4  In the instant case, the BPT found petitioner unsuitable for parole for the

5  following reasons: 1) the offense was carried out in a dispassionate and calculated manner (§

6  2402(c)(1)(B)); 2) the offense demonstrated an exceptionally callous disregard for human

7  suffering (§ 2402(c)(1)(D)); 3) the motive for the offense was inexplicable or trivial (§

8  2402(c)(1)(E)); 4) petitioner had an unstable social history prior to his incarceration (§

9  2402(c)(3)); 5) petitioner's institutional activities did not indicate an enhanced ability to function

10  within the law upon release (§ 2402(d)(9)).  Answer, Exhibit 2, pp. 50-59.

11  /////

12  /////

13

14  [1] Of course, what <u>Biggs</u> was struggling with was the apparent arbitrariness in revisiting
the parole suitability decision using the very same factors which were considered when a
15  petitioner was involved in the criminal process.  That is, in ultimately determining the sentence a
defendant, facing an indeterminate sentence, should receive, at the inception of the process, the
16  district attorney exercises some discretion, utilizing factors such as the manner in which the
crime was committed, motive, previous criminal history and the like, in reaching a charging
17  decision within the parameters of the law.  If a case is bargained out of the process with a
determination that based on law and circumstances an indeterminate term of incarceration with
18  the possibility of parole is the appropriate sentence, again, the very same factors set forth in the
parole suitability regulations are the factors obviously considered at plea bargaining time – again
19  within the parameters of the law.  If the case goes through trial and then to sentencing, the factors
will be considered yet again at sentencing time.  A sentence is then imposed with the settled
20  expectation that the possibility of parole is not a sham, but that a meaningful possibility of parole
exists.  And, the possibility, if meaningful, has to be based upon future conduct as the past cannot
21  be undone, and was considered already.  The California parole regulations have the potential,
nonetheless, to allow for reinstitution of the sentencing process such that if a commissioner or a
22  governor does not like the fact that a certain defendant was sentenced with a possibility of parole,
the established possibility of parole evaporates simply because of a latter day redetermination
23  that the crime was egregious, or the motive was trivial etc. – something that was obviously
apparent at the time the possibility of parole sentence was issued.  Thus, we have cases, like the
24  present one, where the parole suitability parole is denied numerous times based on a
determination that the seriousness of the crime, or a related factor, precludes the possibility of
25  parole.  While it is perfectly fine to have a system where no possibility of parole exists for any
murder or other crime for which an indeterminate life sentence is appropriate, it is not perfectly
26  fine to have a parole system that is based on misrepresentation.

8

1        Four of the five factors relied on by the BPT in finding petitioner unsuitable

2   involved unchanging factors occurring prior to his incarceration, i.e. the circumstances of the

3   offense and his unstable social history.

4        Petitioner argues that there was not some evidence to support the BPT's finding of

5   unsuitability because the unchanging factors relied on by the BPT no longer demonstrated that he

6   posed an unreasonable risk of danger if released on parole.  Pursuant to Biggs, supra, the reliance

7   on these factors alone violated petitioner's right to due process if these factors no longer had

8   predictive value in determining whether petitioner was suitable for parole.  The court will

9   evaluate petitioner's record following his incarceration to determine whether these unchanging

10  factors had any predictive value.

11       The only reason the BPT found petitioner unsuitable for parole based on post-

12  commitment conduct was that he had not sufficiently participated in self-help programs that

13  would help give him insight into the commitment offense.  Answer, Exhibit 2, p. 55.  In making

14  this finding, the BPT relied on psychiatric reports from 1995, 1996 and 2000.  The BPT quoted

15  from the 1995 report which stated,

16       Mr. Evans's tendencies to distort information was evidenced in his responses to
         mental status questions wherein he manifested a pronounced inclination to overly
17       personalize information presented to him.  He appears to have very weak
         boundaries and this contributes to his pattern of distorting information he receives
18       from others.  He is also highly narcissistic and in keeping with his character
         pathology, he possesses an unrealistic sense of entitlement.  This particular type of
19       pathology is not typically amenable to treatment interventions.  Furthermore, he is
         not motivated to make any significant changes in himself.  He is probably of
20       bright normal intelligence and he possesses no meaningful personal insight.  His
         primary defenses are denial, projection, rationalization, and externalization.
21       Judgment in day-to-day matters is fair.  Currently there is no indication that he
         suffers from any type of mood or thought disorder and the diagnostic impression
22       was personality disorder not otherwise specified with narcissistic dependent and
         obsessive compulsive features.

23

24  Answer, Exhibit 2, pp. 55-56.

25       The BPT quoted from the 1996 psychological report:

26  /////

1
2
3
4
5

> Mr. Evans is a friendly manipulative 65 year old man. His intellectual ability appears to be in the average range and he does not have a psychotic disorder. Mr. Evans' ability to reason is intact. However, his judgment is poor. This seems to be a byproduct of a significant self-absorption which impairs his ability to emphasize and accurately read these interactions with others. The above noted psychopathology is indirectly related to the instant offense and that it contributed to his crime but did not determine it. There is no noticeable improvement in this inmate during his period of incarceration.

Answer, Exhibit 2, p. 54.

6
7

> The BPT quoted from the 2000 psychological report:

8
9

> Mr. Evans speaks in a rather impulsive and defensive manner at times with underlying irritability. He continues to deny having committed the offense. This may be due to his actual innocence or an almost delusional belief in his innocence, the latter which would not portend well for him in the future.

10

> *****

11
12
13

> In a more denying scenario, he may have misled others with his intentions, with his impulsive and bravado speech. In either case, one would think that self-help groups might be beneficial in his communications and interaction with others. However, he continues to reject the idea of self-help groups.

14  Answer, Exhibit 2, p. 53.

15      The BPT stated that the 2004 psychological report prepared by Dr. Rouse was not

16  useful because it did not address the concerns that were discussed at the 2003 suitability hearing,

17  although the BPT did not go on to discuss those concerns. Answer, Exhibit 2, p. 52.

18      Attached to the petition as exhibit I is a copy of Dr. Rouse's 2003 psychological

19  report. In the section of the report titled Mental Status Examination, Dr. Rouse states,

20
21
22
23
24
25

> Mr. Evans presented as a well-nourished, well developed white male of the stated age of 73 years. He arrived on time for his appointment at the Satellite Clinic and is described as a medium height, grey haired, older gentleman. He was dressed appropriately and neatly in prison attire and was cooperative with the examiner. His speech was clear, organized and coherent. He was alert and fully oriented in all spheres. His thinking was clear, organized, and directed to inquiry. He denied any history of severe mental problems or any diagnosis of a sever mental disorder. His insight and judgment seemed within the normal limits. His mood was euthymic and his affect was non-restricted. There was nothing indicating that Mr. Evans was suffering from any type of severe mental disorder or was mentally distressed in any form or fashion.

26  \\\\\

1          In the section of the report titled "Estimated Dangerousness," Dr. Rouse stated

2   that petitioner demonstrated sufficient impulse control and had clearly made the most appropriate

3   personal, social and behavior adjustments in the institutional setting.  Petition, Exhibit I.  Dr.

4   Rouse concluded that there was a high probability that petitioner could do the same if released on

5   parole.  Id.  Dr. Rouse stated,

6          It is my professional opinion that Mr. Evans risk of dangerousness is lower than
           that of the average inmate incarcerated here at CSP-Solano and consistent with
7          that of the average citizen in the broader society.  A synthesis of all the
           information reviewed regarding Mr. Evans leads this examiner to determine that
8          Mr. Evans commitment offense was not driven by nor caused by any type of
           mental disorder and there are no current mental health issues which Mr. Evans is
9          burdened with.  Thus, any current considerations that the Board would ponder for
           Mr. Evans parole should be based on factors other than mental health issues.

10

11   Id.

12          Dr. Rouse also prepared a psychological report for petitioner's 2002 suitability

13   hearing.  Petition, Exhibit J.  Dr. Rouse stated that petitioner's insight and judgment were within

14   normal limits.  Id.  Dr. Rouse again concluded that parole should be based on factors other than

15   psychiatric issues.  Id.

16          Attached to the petition as exhibit K is the psychological report prepared in

17   support of petitioner's 1998 suitability hearing by Dr. Clair.  Dr. Clair states,

18          He continues to be unhappy at the tone of his two previous writeups.  A possible
           source of tension was his persisting claim of innocence in the commitment
19          offense.  The writer has less of a problem with this and feels that the truth or
           falsehood of this claim at this point in time has little to do with the inmate's
20          potential for conforming behavior if paroled.  In this respect, I see him as posing
           little or no threat to the public order.

21          *****

22
           No recommendations come to mind.  If denied parole the inmate can be expected
23          to continue his stable adaptation to prison life.

24   Petition, Exhibit K.

25          As noted by petitioner, Cal. Penal Code § 5011(b) prohibits the BPT from

26   requiring an inmate to admit guilt for any crime for which an inmate is committed when setting

1   parole dates.  See also In re Dannenberg, 34 Cal. 4th 1061, 1098-1099, 23 Cal. Rptr. 3d 417,

2   443-444 (2005).  In the instant case, petitioner denied his involvement in the commitment

3   offense, and apparently this has always been his position.  Answer, Exhibit 2, p. 18.  In finding

4   petitioner unsuitable for parole because he failed to participate in self-help programs that would

5   give him insight into the commitment offense, the BPT did not expressly require petitioner to

6   admit guilt but petitioner reasonably perceives it that way.

7            This court considers other factors in order to determine whether the pre-

8   commitment unchanging factors continued to have predictive value.  Petitioner had no juvenile

9   record, which tended to show suitability.  Answer, Exhibit 2, p. 20; § 2402(d)(1) (lack of juvenile

10  record tends to show suitability).  Petitioner's only other criminal conviction was a 1973 federal

11  conviction for counterfeiting.  Answer, Exhibit 20.  Petitioner's lack of a previous violent record

12  supported a finding of suitability.  Section 2402(c)(2) (previous record of violence tends to show

13  unsuitability).

14           Petitioner had received no rules violations report during his entire incarceration,

15  which tended to show his suitability.  Answer, Exhibit 2, p. 30; Section 2402(d)(9) (institutional

16  activities indicate an enhanced ability to function within the law upon release).  Petitioner's age

17  (74) reduced the probability of recidivism.  Section 2402(d)(7) (prisoner's present age reduces

18  probability of recidivism).

19           Petitioner's positive work history, which included excellent work reports and

20  laudatory chronos, tended to show his suitability.  Answer, Exhibit B, p. 57; § 2402(d)(9).

21  Following the 2003 suitability hearing, petitioner had participated in a five week stress

22  management class and was participating in an anger management class, i.e., self-help groups.

23  Answer, Exhibit B, pp. 40, 42.  When asked what he had learned from the anger management

24  class, petitioner told the panel that it was hard to say because "all they've talked about is drinking

25  and drugs and I don't do neither of those, and drinking and getting in fights, I don't do that

26  either..."  Id., p. 41.  Petitioner also told the BPT,

1                 What else have I learned from it, I think before I say anything, and what I've
2 always maintained, if somebody gets combative or derogatory, find some excuse
to go off somewhere else leave them.  I don't have the time or patience to–well, I
3 won't say the patience, I just don't want to get involved with them, I'm not into
violence.

4   Id., p. 41-42.

5          The BPT stated that it was "a little bit dismayed about the answers" petitioner

6 gave to what he learned from anger management, id., p. 57, although one could differ with such

7 an interpretation.  Petitioner stated that he found the information regarding alcohol and drugs not

8 particularly useful because he does not drink or use drugs.  Petitioner also stated that he learned

9 that if someone is engaging in combative behavior, he should walk away.  Petitioner's comments

10 appear appropriate.

11          Petitioner had realistic parole plans.  Section 2402(d)(8).  Petitioner had remarried

12 following his incarceration and planned to live with his wife in Tecopa and receive social

13 security.  Answer, Exhibit B, p. 32.

14          Petitioner maintained stable relationships with family members.  His brother and

15 sister, living in Florida, bought some land in Florida for petitioner to live on following his release

16 from prison.  Answer, Exhibit B, p. 23.  Petitioner had several supportive letters in his file from

17 family members.  Id., pp. 34-38.  Petitioner's family ties tended to show his suitability.  Section

18 2402(d)(1) (stable relationships with others tends to show suitability).

19          Certainly, an inference to be drawn is that the BPT commissioners simply

20 stretched every bit of adverse evidence as a legal cover for their antipathy to this "stubborn old

21 man" who would not admit his complicity in the crime.  Moreover, it also appears stretched to

22 attribute to petitioner's mental state some of the callous acts performed by the actual perpetrators

23 on the victim.  While petitioner would, of course, be legally responsible for the acts of those who

24 he hired, the point of the parole suitability hearing was to assess *petitioner's* suitability for parole

25 – not that of the perpetrators.  If petitioner had actually initiated or encouraged the manner of

26 killing the victim, such would have said much about *his* state of mind and suitability for release,

1   at least for the initial suitability hearings.  However, the record contained no evidence that

2   petitioner had actually planned or had any involvement in deciding the actual method chosen by

3   the perpetrators for their attempted murder, nor did the record reflect that petitioner had any

4   knowledge of a left-to-die victim.  Finally, the commissioners went out of their way to choose the

5   old, adverse psychiatric reports instead of the more recent, favorable ones.  The commissioners

6   decision that this mid-to-late 70's aged prisoner, who has a few years left on his life, if that,

7   would actually pose a danger to individuals or his release community after twenty-plus years

8   incarceration is somewhat fantastic.

9          Nevertheless, the analysis here focuses on the "some evidence" test and the

10  California Supreme Court's acceptance of the basis for the BPT decision.  Although the

11  undersigned would conclude that adoption of the BPT findings as some evidence was clearly

12  erroneous, more is required to vacate the decision of the California court – it must be

13  unreasonable in the AEDPA sense.  The undersigned cannot make that conclusion.

14          Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for

15  a writ of habeas corpus be denied.

16          These findings and recommendations are submitted to the United States District

17  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

18  days after being served with these findings and recommendations, any party may file written

19  objections with the court and serve a copy on all parties.  Such a document should be captioned

20  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

21  shall be served and filed within ten days after service of the objections.  The parties are advised

22  that failure to file objections within the specified time may waive the right to appeal the District

23  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

24  DATED:   3/6/07                          /s/ Gregory G. Hollows

25                                           GREGORY G. HOLLOWS
                                             UNITED STATES MAGISTRATE JUDGE

26  evans.157