IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JAMES EVANS,

    Petitioner,                    No. CIV S-06-0376 LKK GGH P

   vs.

TOM L. CAREY, et al.,             AMENDED

    Respondents.            FINDINGS AND RECOMMENDATIONS

_____/

I. Introduction

      Petitioner, now in his mid-to-late 70's, is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. In 1982 petitioner was convicted of kidnapping for robbery, robbery and attempted murder. Petitioner is serving a sentence of 7 years to life. In this action, petitioner challenges the 2004 decision by the California Board of Prison Terms (BPT) finding him unsuitable for parole. Petitioner argues that the BPT's decision was not supported by sufficient evidence. Petitioner also argues that the BPT violated his right to due process by requiring him to admit guilt in order to be found suitable. This was petitioner's eleventh subsequent parole suitability hearing.

      On March 6, 2007, this court recommended that the petition be denied. In the findings and recommendations, the court acknowledged that this was a close case. On March 6,

1

1  2007, the Ninth Circuit decided <u>Irons v. Carey</u>, 479 F.3d 658 (9th Cir. 2007). Based on <u>Irons</u>,
2  this court finds it even more likely that the Ninth Circuit would uphold the BPT's decision
3  finding petitioner unsuitable for parole. Accordingly, the court amends that findings and
4  recommendations to include a discussion of <u>Irons</u>.

5  II. <u>Anti-Terrorism and Effective Death Penalty Act (AEDPA)</u>

6  The Antiterrorism and Effective Death Penalty Act (AEDPA) applies to this
7  petition for habeas corpus which was filed after the AEDPA became effective. <u>Neelley v. Nagle</u>,
8  138 F.3d 917 (11th Cir.), citing <u>Lindh v. Murphy</u>, 521 U.S. 320, 117 S. Ct. 2059 (1997). The
9  AEDPA "worked substantial changes to the law of habeas corpus," establishing more deferential
10 standards of review to be used by a federal habeas court in assessing a state court's adjudication
11 of a criminal defendant's claims of constitutional error. <u>Moore v. Calderon</u>, 108 F.3d 261, 263
12 (9th Cir. 1997).

13  In <u>Williams (Terry) v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme
14 Court defined the operative review standard set forth in § 2254(d). Justice O'Connor's opinion
15 for Section II of the opinion constitutes the majority opinion of the court. There is a dichotomy
16 between "contrary to" clearly established law as enunciated by the Supreme Court, and an
17 "unreasonable application of" that law. <u>Id</u>. at 1519. "Contrary to" clearly established law applies
18 to two situations: (1) where the state court legal conclusion is opposite that of the Supreme
19 Court on a point of law, or (2) if the state court case is materially indistinguishable from a
20 Supreme Court case, i.e., on point factually, yet the legal result is opposite.

21  "Unreasonable application" of established law, on the other hand, applies to
22 mixed questions of law and fact, that is, the application of law to fact where there are no factually
23 on point Supreme Court cases which mandate the result for the precise factual scenario at issue.
24 <u>Williams (Terry)</u>, 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000). It is this prong of the
25 AEDPA standard of review which directs deference to be paid to state court decisions. While the
26 deference is not blindly automatic, "the most important point is that an *unreasonable* application

of federal law is different from an incorrect application of law....[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at 1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

The state courts need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S. Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An unreasonable error is one in excess of even a reviewing court's perception that "clear error" has occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003).  Moreover, the established Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts.  Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

However, where the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will independently review the record in adjudication of that issue.  "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

Petitioner raised the claims raised in this action in a habeas corpus petition filed in the California Supreme Court.  Answer, Exhibit 4.  On February 1, 2006, the California Supreme Court denied the petition by order citing In re Dannenberg, 34 Cal. 4th 1061 (2005) and In re Rosenkrantz, 29 Cal. 4th 616 (2002).  Answer, Exhibit 5.  Accordingly, the court will

independently review the record to determine whether the denial of the petition by the California Supreme Court was an unreasonable application of the facts to the due process law surrounding parole suitability hearings.

III.  Background

The factual background of petitioner's offense is relevant to the analysis of petitioner's claims.  A factual summary is contained in the probation report, attached to the petition as exhibit B.

> James Eugene Evans, age 51, had a romantic relationship with Agnes "Janie" Whorton for approximately eight years. She is the wife of the victim, Warren Whorton. Evans reportedly attempted to persuade Mrs. Whorton to leave her husband, however, she refused on the grounds that her religious beliefs would not allow her to do this.  In the last few years, Mr. Evans expressed to several of his friends and acquaintances that "something should happen" to Mr. Whorton.  He allegedly also stated that it would be possible to have someone "bump off" Mr. Whorton, since he had a lot of money and it could be made to look like a robbery. In June of 1979, Mr. Evans told Mary Whatley of his "perfect plan."
>
> In February of 1980, Patricia June "P.J." Miller, began to frequent the Pizza King Restaurant owned by Mr. Evans.  She apparently was told of Mr.Evans' idea and, in December of 1980, she told Rich Poma of Mr. Evans' plan to get rid of Warren Whorton.  On December 11, 1980, Mr. Poma left his mother's home in Modesto, enroute to Turlock to meet with Mr. Evans.  Also that afternoon, a phone call was placed from the home of Kenneth Krantz to the Pizza King.  It is the understanding of the investigating agencies that this contact, as well as others between Poma, Krantz and Evans resulted in Mr. Evans offering $1,000 each to Poma and Krantz, for them to murder Warren Whorton.
>
> Mr. Poma and Mr. Krantz "cased" a furniture store in Riverbank, California, owned by Warren Whorton. The two subjects did not see a safe and then decided to rob him at a second store, (Great Valley Furniture) in Oroville.  In late December and early January they made two trips to Oroville.  After the second trip (on about January 8, 1981), they obtained several handguns.
>
> On Sunday night, January 11, Krantz and Poma left Modesto and proceeded to Chico, where they stayed overnight in a motel.  On the next day they observed Mr. Whorton's activities at the Oroville Store.
>
> Sometime between 6:30 and 7:00 p.m., January 12, 1981, Krantz and Poma parked their car near the apartment complex where Mr. Whorton lived.  Krantz armed himself with a .38 revolver, and Mr. Poma with a stolen .45, and donned latex surgical gloves.  When Mr. Whorton arrived at his apartment complex, they reportedly confronted him while displaying the weapons in their waistbands, and commanded him to get back into his own car.  Mr. Poma drove the car back to the furniture store, Krantz sitting on the passenger side, Mr. Whorton between them.

4

Mr. Whorton was instructed by the subjects not to look at them and neither subject made any apparent attempt to disguise his face.

After arriving at the store, the subjects had Mr. Whorton unlock the door. Upon entering the store, they demanded that he open the safe, and were told that there was no safe on the premises. After a cursory search, the two defendants did not find a safe, and took Mr. Whorton upstairs where he was tied up with an electrical cord and placed on a bed. The store was then searched for money, Mr. Krantz finding approximately $120.00 in the cash box of the office area. Poma reportedly locating a small amount of money in a money clip which was carried in Mr. Whorton's pocket. It appears that, for whatever reason, Poma then struck Mr. Whorton in the head three or four times with a hammer which was found somewhere inside the store, after which Mr. Krantz cut the victim's throat with a straight edge razor he had been carrying on his person. Leaving the victim for dead, the two subjects departed the store, returning to the apartment complex in the victim's vehicle. They then got into the car in which they had been driving and returned to Modesto.

Early the following morning, Mr. Whorton was discovered by his employees. He was immediately rushed to a hospital, underwent surgery and although in extremely critical condition for some days, he survived.

It appears that after the incident, Mr. Poma bragged about it to at least two acquaintances in the Modesto area, one of whom contacted law enforcement. An investigation was effected which ultimately led to the arrest of Krantz and Poma on January 27, in Modesto. They were shortly thereafter returned to custody to this jurisdiction where they were charged and convicted with kidnapping for the purpose of robbery, robbery, and attempted murder. Initial pleas of not guilty were entered and, on June 15, 1981, both defendants entered pleas of guilty for kidnapping for robbery and attempt[ed] murder, both having personally inflicted great bodily injury in connection with the commission of the attempted murder. On July 9, 1981, both Krantz and Poma were sentenced to state prison for consecutive sentences of life and 108 months plus 30 months enhancement.

James Evans had been arrested on February 19, 1981, for the same offenses as Krantz and Poma. He pled not guilty to all charges and was granted a jury hearing. That hearing began September 28, 1981, and was presided over by the Honorable Lucian Vandergrift. In November of 1981, Judge Vandergrift was seriously injured in an automobile accident and the hearing was recessed. Approximately four months later, the hearing was reconvened with the Honorable Reginal Watt presiding. On April 14, 1982, the jury was out for less than two hours, returning a verdict of guilty on all counts.

IV.  Discussion

In Sass v. California Bd. of Prison Terms, 461 F.3d 1123 (9th Cir. 2006), the Ninth Circuit found that California law gives rise to a federally protected liberty interest in parole release.

5

In the parole context, the requirements of due process are met if "some evidence" supports the decision." Sass, 461 F.3d at 1128-1129. In reviewing the BPT decision, the court analyzes whether the factors relied on by the BPT, set forth in the relevant regulations, are supported by some evidence.

Cal. Code of Regulations, section 2402(c), sets forth the circumstances tending to show unsuitability. The court lists those of significance here:

> (1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:
>
> (A) Multiple victims were attacked, injured or killed in the same or separate incidents.
>
> (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style manner.
>
> *****
>
> (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
>
> (E) The motive for the crime is inexplicable or very trivial in relation to the offense.
>
> (2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.
>
> (3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others.
>
> *****
>
> *****
>
> (6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail.

Section 2402(d) sets forth the circumstances tending to indicate suitability:

> (1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to the victims.

(2) Stable Social History.  The prisoner has experienced reasonably stable relationships with others.

(3) Signs of Remorse.  The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

(4) Motivation for the Crime.  The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.

(5) Battered Woman Syndrome . . .

(6) Lack of Criminal History.  The prisoner lacks any significant history of violent crime.

(7) Age.  The prisoner's present age reduces the probability of recidivism.

(8) Understanding and Plans for Future.  The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

(9) Institutional Behavior.  Institutional activities indicate an enhanced ability to function within the law upon release.

In Biggs v. Terhune, 334 F.3d 910 (9th Cir. 2003) the Ninth Circuit indicated that a continued reliance on an unchanging factor such as the circumstances of the offense could result in a due process violation.  Biggs was serving a sentence of twenty-five years to life following a 1985 first degree murder conviction.  In the case before the Ninth Circuit, Biggs challenged the 1999 decision by the BPT finding him unsuitable for parole despite his record as a model prisoner.  334 F.3d at 913.  While the Ninth Circuit rejected several of the reasons given by the BPT for finding Biggs unsuitable, it upheld three:  1) petitioner's commitment offense involved the murder of a witness; 2) the murder was carried out in a manner exhibiting a callous disregard for the life and suffering of another; 3) petitioner could benefit from therapy.  334 F.3d at 913.

The Ninth Circuit cautioned the BPT regarding its continued reliance on the gravity of the offense and petitioner's conduct prior to the offense:

> As in the present instance, the parole board's sole supportable reliance on the gravity of the offense and conduct prior to imprisonment to justify denial of parole can be initially justified as fulfilling the requirements set forth by state law. Over time, however, should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of his offense would raise serious questions involving his liberty interest.

334 F.3d at 916.[1]

In the instant case, the BPT found petitioner unsuitable for parole for the following reasons: 1) the offense was carried out in a dispassionate and calculated manner (§ 2402(c)(1)(B)); 2) the offense demonstrated an exceptionally callous disregard for human suffering (§ 2402(c)(1)(D)); 3) the motive for the offense was inexplicable or trivial (§ 2402(c)(1)(E)); 4) petitioner had an unstable social history prior to his incarceration (§ 2402(c)(3)); 5) petitioner's institutional activities did not indicate an enhanced ability to function

---

[1] Of course, what <u>Biggs</u> was struggling with was the apparent arbitrariness in revisiting the parole suitability decision using the very same factors which were considered when a petitioner was involved in the criminal process. That is, in ultimately determining the sentence a defendant, facing an indeterminate sentence, should receive, at the inception of the process, the district attorney exercises some discretion, utilizing factors such as the manner in which the crime was committed, motive, previous criminal history and the like, in reaching a charging decision within the parameters of the law. If a case is bargained out of the process with a determination that based on law and circumstances an indeterminate term of incarceration with the possibility of parole is the appropriate sentence, again, the very same factors set forth in the parole suitability regulations are the factors obviously considered at plea bargaining time – again within the parameters of the law. If the case goes through trial and then to sentencing, the factors will be considered yet again at sentencing time. A sentence is then imposed with the settled expectation that the possibility of parole is not a sham, but that a meaningful possibility of parole exists. And, the possibility, if meaningful, has to be based upon future conduct as the past cannot be undone, and was considered already. The California parole regulations have the potential, nonetheless, to allow for reinstitution of the sentencing process such that if a commissioner or a governor does not like the fact that a certain defendant was sentenced with a possibility of parole, the established possibility of parole evaporates simply because of a latter day redetermination that the crime was egregious, or the motive was trivial etc. – something that was obviously apparent at the time the possibility of parole sentence was issued. Thus, we have cases, like the present one, where the parole suitability parole is denied numerous times based on a determination that the seriousness of the crime, or a related factor, precludes the possibility of parole. While it is perfectly fine to have a system where no possibility of parole exists for any murder or other crime for which an indeterminate life sentence is appropriate, it is not perfectly fine to have a parole system that is based on misrepresentation.

8

within the law upon release (§ 2402(d)(9)).  Answer, Exhibit 2, pp. 50-59.

Four of the five factors relied on by the BPT in finding petitioner unsuitable involved unchanging factors occurring prior to his incarceration, i.e. the circumstances of the offense and his unstable social history.

Petitioner argues that there was not some evidence to support the BPT's finding of unsuitability because the unchanging factors relied on by the BPT no longer demonstrated that he posed an unreasonable risk of danger if released on parole.  Pursuant to Biggs, supra, the reliance on these factors alone violated petitioner's right to due process if these factors no longer had predictive value in determining whether petitioner was suitable for parole.  The court will evaluate petitioner's record following his incarceration to determine whether these unchanging factors had any predictive value.

The only reason the BPT found petitioner unsuitable for parole based on post-commitment conduct was that he had not sufficiently participated in self-help programs that would help give him insight into the commitment offense.  Answer, Exhibit 2, p. 55.  In making this finding, the BPT relied on psychiatric reports from 1995, 1996 and 2000.  The BPT quoted from the 1995 report which stated,

> Mr. Evans's tendencies to distort information was evidenced in his responses to mental status questions wherein he manifested a pronounced inclination to overly personalize information presented to him.  He appears to have very weak boundaries and this contributes to his pattern of distorting information he receives from others.  He is also highly narcissistic and in keeping with his character pathology, he possesses an unrealistic sense of entitlement.  This particular type of pathology is not typically amenable to treatment interventions.  Furthermore, he is not motivated to make any significant changes in himself.  He is probably of bright normal intelligence and he possesses no meaningful personal insight.  His primary defenses are denial, projection, rationalization, and externalization.  Judgment in day-to-day matters is fair.  Currently there is no indication that he suffers from any type of mood or thought disorder and the diagnostic impression was personality disorder not otherwise specified with narcissistic dependent and obsessive compulsive features.

Answer, Exhibit 2, pp. 55-56.

/////

1   The BPT quoted from the 1996 psychological report:

2   Mr. Evans is a friendly manipulative 65 year old man.  His intellectual ability
appears to be in the average range and he does not have a psychotic disorder.  Mr.
Evans' ability to reason is intact.  However, his judgment is poor.  This seems to
be a byproduct of a significant self-absorption which impairs his ability to
emphasize and accurately read these interactions with others.  The above noted
psychopathology is indirectly related to the instant offense and that it contributed
to his crime but did not determine it.  There is no noticeable improvement in this
inmate during his period of incarceration.

Answer, Exhibit 2, p. 54.

The BPT quoted from the 2000 psychological report:

Mr. Evans speaks in a rather impulsive and defensive manner at times with
underlying irritability.  He continues to deny having committed the offense.  This
may be due to his actual innocence or an almost delusional belief in his innocence,
the latter which would not portend well for him in the future.

*****

In a more denying scenario, he may have misled others with his intentions, with
his impulsive and bravado speech.  In either case, one would think that self-help
groups might be beneficial in his communications and interaction with others.
However, he continues to reject the idea of self-help groups.

Answer, Exhibit 2, p. 53.

The BPT stated that the 2004 psychological report prepared by Dr. Rouse was not useful because it did not address the concerns that were discussed at the 2003 suitability hearing, although the BPT did not go on to discuss those concerns. Answer, Exhibit 2, p. 52.

Attached to the petition as exhibit I is a copy of Dr. Rouse's 2003 psychological report. In the section of the report titled Mental Status Examination, Dr. Rouse states,

Mr. Evans presented as a well-nourished, well developed white male of the stated
age of 73 years.  He arrived on time for his appointment at the Satellite Clinic and
is described as a medium height, grey haired, older gentleman.  He was dressed
appropriately and neatly in prison attire and was cooperative with the examiner.
His speech was clear, organized and coherent.  He was alert and fully oriented in
all spheres.  His thinking was clear, organized, and directed to inquiry.  He denied
any history of severe mental problems or any diagnosis of a sever mental disorder.
His insight and judgment seemed within the normal limits.  His mood was
euthymic and his affect was non-restricted.  There was nothing indicating that Mr.
Evans was suffering from any type of severe mental disorder or was mentally
distressed in any form or fashion.

10

In the section of the report titled "Estimated Dangerousness," Dr. Rouse stated that petitioner demonstrated sufficient impulse control and had clearly made the most appropriate personal, social and behavior adjustments in the institutional setting. Petition, Exhibit I. Dr. Rouse concluded that there was a high probability that petitioner could do the same if released on parole. Id. Dr. Rouse stated,

> It is my professional opinion that Mr. Evans risk of dangerousness is lower than that of the average inmate incarcerated here at CSP-Solano and consistent with that of the average citizen in the broader society. A synthesis of all the information reviewed regarding Mr. Evans leads this examiner to determine that Mr. Evans commitment offense was not driven by nor caused by any type of mental disorder and there are no current mental health issues which Mr. Evans is burdened with. Thus, any current considerations that the Board would ponder for Mr. Evans parole should be based on factors other than mental health issues.

Id.

Dr. Rouse also prepared a psychological report for petitioner's 2002 suitability hearing. Petition, Exhibit J. Dr. Rouse stated that petitioner's insight and judgment were within normal limits. Id. Dr. Rouse again concluded that parole should be based on factors other than psychiatric issues. Id.

Attached to the petition as exhibit K is the psychological report prepared in support of petitioner's 1998 suitability hearing by Dr. Clair. Dr. Clair states,

> He continues to be unhappy at the tone of his two previous writeups. A possible source of tension was his persisting claim of innocence in the commitment offense. The writer has less of a problem with this and feels that the truth or falsehood of this claim at this point in time has little to do with the inmate's potential for conforming behavior if paroled. In this respect, I see him as posing little or no threat to the public order.
>
> *****
>
> No recommendations come to mind. If denied parole the inmate can be expected to continue his stable adaptation to prison life.

Petition, Exhibit K.

As noted by petitioner, Cal. Penal Code § 5011(b) prohibits the BPT from requiring an inmate to admit guilt for any crime for which an inmate is committed when setting

11

parole dates.  See also In re Dannenberg, 34 Cal. 4th 1061, 1098-1099, 23 Cal. Rptr. 3d 417, 443-444 (2005).  In the instant case, petitioner denied his involvement in the commitment offense, and apparently this has always been his position.  Answer, Exhibit 2, p. 18.  In finding petitioner unsuitable for parole because he failed to participate in self-help programs that would give him insight into the commitment offense, the BPT did not expressly require petitioner to admit guilt but petitioner reasonably perceives it that way.

      This court considers other factors in order to determine whether the pre-commitment unchanging factors continued to have predictive value.  Petitioner had no juvenile record, which tended to show suitability.  Answer, Exhibit 2, p. 20; § 2402(d)(1) (lack of juvenile record tends to show suitability).  Petitioner's only other criminal conviction was a 1973 federal conviction for counterfeiting.  Answer, Exhibit 20.  Petitioner's lack of a previous violent record supported a finding of suitability.  Section 2402(c)(2) (previous record of violence tends to show unsuitability).

      Petitioner had received no rules violations report during his entire incarceration, which tended to show his suitability.  Answer, Exhibit 2, p. 30; Section 2402(d)(9) (institutional activities indicate an enhanced ability to function within the law upon release).  Petitioner's age (74) reduced the probability of recidivism.  Section 2402(d)(7) (prisoner's present age reduces probability of recidivism).

      Petitioner's positive work history, which included excellent work reports and laudatory chronos, tended to show his suitability.  Answer, Exhibit B, p. 57; § 2402(d)(9). Following the 2003 suitability hearing, petitioner had participated in a five week stress management class and was participating in an anger management class, i.e., self-help groups.  Answer, Exhibit B, pp. 40, 42.  When asked what he had learned from the anger management class, petitioner told the panel that it was hard to say because "all they've talked about is drinking and drugs and I don't do neither of those, and drinking and getting in fights, I don't do that either..."  Id., p. 41.  Petitioner also told the BPT,

> What else have I learned from it, I think before I say anything, and what I've always maintained, if somebody gets combative or derogatory, find some excuse to go off somewhere else leave them. I don't have the time or patience to–well, I won't say the patience, I just don't want to get involved with them, I'm not into violence.

Id., p. 41-42.

The BPT stated that it was "a little bit dismayed about the answers" petitioner gave to what he learned from anger management, id., p. 57, although one could differ with such an interpretation. Petitioner stated that he found the information regarding alcohol and drugs not particularly useful because he does not drink or use drugs. Petitioner also stated that he learned that if someone is engaging in combative behavior, he should walk away. Petitioner's comments appear appropriate.

Petitioner had realistic parole plans. Section 2402(d)(8). Petitioner had remarried following his incarceration and planned to live with his wife in Tecopa and receive social security. Answer, Exhibit B, p. 32.

Petitioner maintained stable relationships with family members. His brother and sister, living in Florida, bought some land in Florida for petitioner to live on following his release from prison. Answer, Exhibit B, p. 23. Petitioner had several supportive letters in his file from family members. Id., pp. 34-38. Petitioner's family ties tended to show his suitability. Section 2402(d)(1) (stable relationships with others tends to show suitability).

Certainly, an inference to be drawn is that the BPT commissioners simply stretched every bit of adverse evidence as a legal cover for their antipathy to this "stubborn old man" who would not admit his complicity in the crime. Moreover, it also appears stretched to attribute to petitioner's mental state some of the callous acts performed by the actual perpetrators on the victim. While petitioner would, of course, be legally responsible for the acts of those who he hired, the point of the parole suitability hearing was to assess *petitioner's* suitability for parole – not that of the perpetrators. If petitioner had actually initiated or encouraged the manner of killing the victim, such would have said much about *his* state of mind and suitability for release,

at least for the initial suitability hearings.  However, the record contained no evidence that petitioner had actually planned or had any involvement in deciding the actual method chosen by the perpetrators for their attempted murder, nor did the record reflect that petitioner had any knowledge of a left-to-die victim.  Finally, the commissioners went out of their way to choose the old, adverse psychiatric reports instead of the more recent, favorable ones.  The commissioners decision that this mid-to-late 70's aged prisoner, who has a few years left on his life, if that, would actually pose a danger to individuals or his release community after twenty-plus years incarceration is somewhat fantastic.

Nevertheless, the analysis here focuses on the "some evidence" test and the California Supreme Court's acceptance of the basis for the BPT decision.  Although the undersigned would conclude that adoption of the BPT findings as some evidence was clearly erroneous, more is required to vacate the decision of the California court – it must be unreasonable in the AEDPA sense.  The undersigned cannot make that conclusion.

For the following reasons, the court also finds that there was sufficient evidence to find petitioner unsuitable for parole based on the Ninth Circuit's recent decision in Irons v. Carey, 479 F.3d 658 (9th Cir. 2007).

Since the approximate five years since the issuance of McQuillion v. Duncan, 306 F.3d 895 (9th Cir. 2002), we know this about the liberty interest implicated by California's parole laws regarding indeterminate sentences, i.e., parole suitability hearings, which if successful for the petitioner, will result in the establishment of an actual parole date (but never less than the minimum term):

1. A liberty interest exists, Irons v. Carey, 479 F.3d 658 (9th Cir. 2007) citing cases;

2. Reliance on unchanging factors in denying parole suitability *might* implicate a violation of that liberty interest.  Biggs v. Terhune, 334 F.3d 910, 916 (9th Cir. 2003);

/////

1  3. A finding by the Board of Parole Hearings (formerly BPT) (or at a later time, by the Governor) concerning the circumstances or gravity of the crime in and of itself is sufficient to deny suitability; In re Rosenkrantz, 29 Cal. 4th 616, 682, 128 Cal. Rptr. 2d 104, 161; Irons, 479 F.3d at 664; but the nature of the offense must be "particularly egregious" to constitute a basis to deny parole suitability. Rosenkrantz, 29 Cal. 4th at 683, 128 Cal. Rptr. 2d at 161.

4. However, "particularly egregious" means nothing more than finding elements in excess of those "minimally necessary to convict." In re Dannenberg, 34 Cal. 4th 1061, 1095, 23 Cal. Rptr. 3d 417, 440 (2005);

5. If the petitioner has served less than the minimum term of his indeterminate sentence, "all we hold today, therefore, is that, given the particular circumstances of the offenses in these cases, due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms." Irons 479 at 665, but see footnote 1 of Irons expressing no opinion if the prisoner has served more than his minimum term, i.e., *maybe* that is the time frame against which reliance on unchanging factors is truly suspect[2];

6. If the BPH determined that the crime was vicious, or performed in a callous manner, or the motive was trivial, and so forth – all factors relating to the circumstances of the crime – and such is adopted by the state courts on review, a federal court must find the state court decision(s) AEDPA-unreasonable before a writ of habeas corpus may be granted. Irons, supra.

With respect, after Irons, the undefined "mights" and "maybes" serve as an indecipherable present guide to knowing just when the liberty interest in parole may be violated by reliance on unchanging factors. Moreover, one does not know whether such reliance, if it is

---

[2] Nothing in California statutes or regulations, see Cal. Penal Code 3041, 15 CCR § 2402, would expressly so limit the decision of the BPH and Governor, thus the potential limitation must be of federal origin. However, as undue reliance on unchangeable factors has never been found thus far by the Ninth Circuit, the commencement point of the limitation, or the precise blend of crime circumstances and years since, has not been  defined. We do know that in Irons, five times of application was insufficient. Irons did not decide that reliance on unchanging factors after the minimum term had been served was unlawful. We simply know that "maybe" that will be the case.

15

ever held to be insufficient, is based on passage of time alone, or is an uncertain blend of crime circumstances and passage of time.  The state courts' adoption of the BPH (BPT[3]) or Governor's decision about the circumstances of the crime is now essentially unreviewable – at least prior to the expiration of the minimum term.  That is, the circumstances of the crime in terms of viciousness, callousness, triviality and the like, is essentially an unchanging value judgment whose correctness cannot often be disputed regardless of the time when such a judgment is made – right after the conviction, just prior to expiration of a minimum term, well after the expiration of a minimum term. [4]

Review of the federal appellate cases demonstrates that no guided finding of undue reliance on unchanging factors can be made in this case.  Biggs v. Terhune, supra, the case that commenced the discussion on unchanging factors, involved the first degree bludgeoning murder of a witness facilitated, but not committed, by Biggs.  He was denied parole eligibility at his initial hearing in 1999 in part because of the gravity of the crime.  All might agree that such a murder was grave, and it will never be properly classified as anything but such.  Nevertheless, the Ninth Circuit found that "continued reliance" on unchanging factors could violate due process.  Although not stating such, the intimation of Biggs was that the third or fourth time of reliance on the circumstances of the crime would be too much.  Certainly, it was not understood by the undersigned from reading Biggs that the time at which continued reliance would be too much

---

[3] The Board of Prison Terms recently had its name changed to the Board of Prison Hearings.

[4] The undersigned has previously determined the arbitrary nature and lack of predictive value generally found in a circumstances of the crime parole suitability denial based on unchanging circumstances despite the passage of sixteen years and more from the date of the conviction coupled with an unblemished prison record.  See Irons v. Warden of California State Prison-Solano, 358 F. Supp. 2d 936, 947 (E.D. Cal. 2005).  That analysis, focusing on the predictive nature of the crime for future violence in combination with expert psychiatric reports or other forward looking evidence, has been cited with approval by the California Court of Appeal.  In re Elkins, 144 Cal. App. 4th 475, 50 Cal. Rptr. 3d 503, 522 (2006); In re Scott, 133 Cal. App. 4th 573, 34 Cal. Rptr. 3d 905 (2005).  However, since that analysis only received the comment that it was an "understandable [AEDPA] error" in the concurrence of Judge Reinhardt, that analysis concerning the trigger time of undue reliance will not be utilized herein.

would occur in 2010 – the time at which Biggs will have served his minimum term. Biggs' minimum term is served in 2010, and Biggs will have had approximately 5 or 6 more hearings by that time. However, subsequent Ninth Circuit cases have not upheld the undersigned's reading of Biggs.

In Sass, no comparison review of other cases was undertaken, there was simply the one sentence holding that the "evidence of Sass' prior offenses [prior DUIs] and the gravity of his convicted offenses [DUI resulting in a death and injury] constitute some evidence to support the Board's decision." Id., 461 F.3d 1123; the dissent disagreed, and found AEDPA unreasonableness. The Ninth Circuit was reviewing a third denial of suitability. If jurists of the Ninth Circuit cannot agree whether the circumstances of the crime can constitute some evidence given three hearings, how will the BPH or the undersigned know when to stop using the circumstances of a crime as the reason to deny parole eligibility. What will be the analytical watershed point of departure from routinely upholding the BPH assessment of the circumstances of the crime, and more importantly, why? Will the fourth hearing be sufficient, or should it be the seventh? Will the analysis simply hinge on the non-analytical fact that Sass will have passed his minimum terms of years under his sentence? Would a later BPT finding of egregiousness be AEDPA unreasonable simply because Sass just passed his minimum term as opposed to just before the expiration of his minimum term? None of these questions have been answered.

In Irons, after five parole suitability hearings, the Ninth Circuit determined that the second degree murder of a perceived thieving drug dealer by a wildly shooting, and then stabbing, angry "victim" of the deceased was comparatively more egregious than the murder in Sass. Perhaps so; perhaps other jurists would locate this line in another position because of the societal impact that drunk drivers impose in this country. Both positions have their points. But one can validly question whether the ultimate goal of every parole eligibility hearing, determining *future* safety of the community, can forever be based on personal judgments on the comparative seriousness of crimes committed decades ago.

Nevertheless, taking an implied cue from Irons that the minimum term might serve as an analytical change point, the undersigned finds that prior to that time, absent extraordinary circumstances, the BPH determination on factors relating to the circumstances of the crime are essentially unreviewable, i.e., the determination constitutes "some evidence" sufficient to deny parole eligibility (suitability).

This case cannot be decided on the above finding because petitioner's 22 year incarceration at the time of the 2004 suitability hearing has exceeded his minimum term of 7 years. The 2004 hearing was his eleventh subsequent parole hearing.

Nearly the same day as Irons was decided, the Ninth Circuit reversed a grant of parole eligibility in Kunkler v. Muntz, 2007 WL 683970 (9th Cir. 2007).[5] The facts of the second degree murder were not set forth in the opinion, but the fact of Kunkler's 1983 conviction, and the fact that Kunkler had been considered for parole suitability *ten times* were set forth. Kunkler had been imprisoned well beyond any minimum term. On his last two BPT (now BPH) hearings, the commissioners had found Kunkler suitable for parole, but the Governor reversed both decisions in part on his perception of the seriousness of the crime. Indeed, this was *the* ground on which the state courts in unpublished orders had ultimately upheld the Governor's decision. The district court applied the Biggs dictum regarding reliance on unchanging factors. In reversing the district court, the Ninth Circuit, citing Sass, viewed the Biggs dictum as merely advice to the *next BPH panel* that it might wish to depart from its continued reliance on a non-changing factor. Kunkler at *2 ("'it is not [this court's] function to speculate about how future parole hearings could proceed.'"). Evidently, no matter how many times the BPH and/or the Governor utter an undoubtedly correct conclusion that a murder is serious, or a motive trivial, or that the victim suffered, these unchanging factors will always constitute "some evidence" in

---

[5] Unpublished Ninth Circuit decisions may be cited commencing with decisions issued in 2007. Ninth Circuit Rule 36-3. Although still not precedential in the binding sense, the unpublished decisions do have a certain amount of persuasive value, and indicate how Ninth Circuit judges apply binding precedent.

18

1 federal habeas corpus review.

2   As discussed above, the BPT found that the offense was carried out in a dispassionate and calculated manner, demonstrated an exceptionally callous disregard for human suffering and that the motive for the offense was trivial or inexplicable.  Nevertheless, in light of the above authority, the undersigned cannot find at this time that the state courts in this case were AEDPA unreasonable by failing to reject the unchanging circumstances conclusion of the BPT. Thus, as a matter of law, some evidence existed to satisfy the standards of the parole suitability liberty interest.

  Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

  These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED: 4/20/07

/s/ Gregory G. Hollows
_____
GREGORY G. HOLLOWS
UNITED STATES MAGISTRATE JUDGE

evans376.157(2)